UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 1:24-cr-226-7 (BAH) |
| | : | |
| BRIYON SHUFORD, | : | |
| | : | |
| Defendant. | : | |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing as to Defendant Briyon Shuford (hereafter, the "Defendant").[1] On October 31, 2024, the Defendant pled guilty to a Superseding Information [ECF No. 83], charging him with Conspiracy to Distribute and Possess with Intent to Distribute a Mixture and Substance Containing a Detectable Amount of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846 (Count One); Possessing a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Two); and Aggravated Assault while Armed, in violation of 22 D.C. §§ 404.01 and 4502 (Count Three).

Pursuant to the terms of the plea agreement [ECF No. 85] and Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties have agreed that a sentence of 161 to 171 months of incarceration is appropriate. For the reasons set forth below, the United States respectfully requests that the Court impose a sentence of 166 months of incarceration, to be followed by 60 months of supervised release.

---

[1] Sentencing is scheduled for January 31, 2025.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

The Defendant's guilty plea is the result of his deliberate participation in a violent, armed group of drug dealers known as the "21st and Vietnam" crew. Members of the crew, some of whom identify the area they frequent as the "I Block," operated in a residential area in Northeast Washington, D.C., specifically the area colloquially known as "21st and Maryland." This refers to the area surrounding the intersection of 21st Street and Maryland Avenue NE, Washington, D.C., which consists mainly of low-rise apartments and row homes, and includes the 1900 block of I Street NE, Washington, D.C. (I Street NE is one block south of and parallel to Maryland Avenue NE. 19th Street NE is the next street to the west of and parallel to 21st Street NE.) In addition to being home to many D.C. residents, the area is also home to schools, playgrounds, recreational centers, and multiple businesses.

Within this D.C neighborhood alone, this crew has been responsible for the distribution of significant quantities of multiple types of narcotics, including crack cocaine, fentanyl, methamphetamine, phencyclidine ("PCP"), and n-n-dimethylpentylone ("boot"). Moreover, in a disturbing illustration of the link between drug trafficking and violence, 21st and Vietnam crew members have also been involved in multiple instances of firearms possession and shootings. These instances include two shootings charged in connection with this case: the March 7, 2024, incident in which co-defendant Charles Manson opened fire on a passerby walking his dog near the crew's open-air drug market; and the April 19, 2024 drive-by shooting, committed by this Defendant and co-defendant Trevon Palmer, which wounded four people and terrorized others.

Although they certainly did not constrain their drug activities and violence to one exclusive area, the crew members, including the Defendant, frequently used an apartment building, located at 1919 I Street NE, Washington, D.C., as a base of operations for their criminal conduct.

Specifically, members of the crew built their open-air drug market around the apartment building and its surroundings, selling drugs outside in the front and the rear, as well as the in first-floor hallway of the apartment building. These sales occurred on a near daily basis between at least June 2023, when the investigation began, and May 2024, when they were arrested. Indeed, the Defendant and other crew members were so emboldened by their perceived invincibility that when one of the apartments became vacant (Apartment 101), they did not hesitate to begin using it for their own nefarious purposes. It was from this very apartment building that the Defendant and Palmer departed before committing the April 19, 2024, drive-by shooting, and it was to this apartment that they returned after completing the horrific assault.

A. <u>April 19, 2024 Mount Olivet Shooting</u>

On the morning of April 19, 2024, at around 10:50 a.m., the Defendant arrived at the apartment building located at 1919 I Street NE, where he met up with co-defendant Palmer. As the Defendant acknowledged in the Statement of Offense [ECF No. 86] in support of his guilty plea, they departed in the Defendant's own vehicle before exchanging it for a stolen Infiniti sedan. After getting into the stolen vehicle, which the Defendant was driving, they headed to the 1200 block of Mt. Olivet Road NE, Washington, D.C. – both armed with firearms – and hunted for members of a rival crew.

After finding what they believed to be appropriate targets, both the Defendant and Palmer opened fire from the vehicle, shooting indiscriminately into the parking lot of the Circle 7 Food and Grocery Mart without regard for innocent bystanders or passing cars. Indeed, the Defendant – presumably so eager to ensure he got his "shots" in as well – almost lost control of the vehicle as he opened fire. Ultimately, the Defendant and Palmer accomplished what they set out to do – shooting four individuals, who sustained injuries to the hips, thighs, and/or buttocks that required

medical attention, and terrorizing still others who ran for their lives once gunfire erupted. Having completed their objective, the Defendant and Palmer ditched the stolen vehicle and attempted to cover their tracks by separating briefly – walking in different directions before rejoining at a nearby home. After they were reunited, the Defendant and Palmer traveled together back to 1919 I St. NE via Uber, apparently unphased by the devastation they left behind.

### B. Narcotics Trafficking and Firearms Possession

Although the Defendant, unlike many of his co-defendants, did not sell narcotics directly to an undercover law enforcement officer ("UC") during the course of this investigation, it is undisputed that he was an equal participant in the crew's drug activities, both by selling drugs himself and by working with his co-conspirators to do so. For example, and as the Defendant also acknowledged in the Statement of Offense [ECF No. 86], he drove one of his co-defendants (Damien Jenkins) to meet with a UC, where on that single occasion Jenkins provided the UC with more than 80 grams of fentanyl.[2] During the transaction, the Defendant remained nearby in the vehicle, conducting another narcotics sale. In addition to this transaction, surveillance demonstrated the Defendant's regular engagement in apparent narcotics distribution in and around 1919 I St. NE, including on one occasion where he appears to don a surgical mask and gloves before beginning to prepare narcotics. Moreover, communications between the Defendant and co-defendant Jamiek Bassil, in which Bassil asks the Defendant for help in getting "cut" – a term for substances used to prepare narcotics for redistribution, further illustrate the Defendant's involvement in drug trafficking, as reflected in Figure A below:

---

[2] This drug sale occurred on March 29, 2024 – not February 5, 2024 – as is erroneously stated in the Statement of Offense [ECF No. 86].

4



*Figure A: June 2023 Communications between Defendant and Bassil*

Nor can the Defendant dispute his penchant for firearms, or that he has been in possession

5

of firearms on multiple occasions, as depicted in Figure B below:



*Figure B: Images from Defendant's iCloud from October 2023 (based on metadata)*

The Defendant's involvement in narcotics trafficking and with firearms is also borne out by the facts and circumstances of his arrest at his home in this case. On May 15, 2024, law enforcement arrested the Defendant and searched his residence pursuant to a warrant. Among other items recovered from the residence, law enforcement recovered distribution quantities of suspected marijuana and indicia of narcotics distribution, including packaging supplies (multiple scales with suspected drug residue, a heat sealer, empty capsules, and plastic baggies). Law enforcement also recovered a Glock 30 firearm, loaded with a round in the chamber, and $12,637 in U.S. currency.

## II.    LEGAL STANDARD

Pursuant to 18 U.S.C. § 3553(a), the Court shall impose a sentence that is sufficient, but not greater than necessary, to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal

conduct;" "to protect the public from further crimes of the defendant;" and to "provide the defendant with needed educational or vocational training." 18 U.S.C. § 3553(a)(2). In addition, the Court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" the types of sentences available, the Sentencing Guidelines; any pertinent policy statements; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims. *Id.* § 3553(a).

The listed factors in 18 U.S.C. § 3553(a) include the following:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The need for the sentence imposed –
   a) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   b) To afford adequate deterrence to criminal conduct;
   c) To protect the public from further crimes of the defendant; and
   d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The kinds of sentence and the sentencing range established for –
   a) The applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
      i) Issued by the Sentencing Commission . . . ; and
      ii) That . . . are in effect on the date the defendant is sentenced

5) Any pertinent policy statement –
   a) Issued by the Sentencing Commission . . . and
   b) That . . . is in effect on the date the defendant is sentenced

6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7) The need to provide restitution to any victims of the offense.

Procedurally, after calculating the applicable Guidelines range, the Court should next consider all the applicable factors set forth in 18 U.S.C. § 3553(a). Indeed, the Guidelines

7

themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007).

### III.   GUIDELINES CALCULATION

#### A.   Total Offense Level

With respect to Count One, the base offense level for a violation of 21 U.S.C. § 841(a)(1) is governed by U.S.S.G. § 2D1.1(c)(8). As detailed in the Revised Final Presentence Report (the "PSR") [ECF No. 118] and the plea agreement [ECF No. 85], the base offense level for Count One is 24 because the Defendant is accountable for more than 40 grams but less than 160 grams of fentanyl. After adjustments for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a) and (b), the final offense level for Count One is 21.[3] As to Count Two, the applicable guidelines sentence for a violation of 18 U.S.C. § 924(c)(1)(A)(i) is governed by U.S.S.G. § 2K2.4(b). With respect to Count Three, a violation of 22 D.C. Code §§ 404.01 and 4502 is governed by the D.C. Voluntary Sentencing Guidelines ("D.C. VSG") and falls within Offense Severity Group 4.

#### B.   Criminal History Category

The PSR writer calculates the Defendant to have a total of two criminal history points, which places him in Criminal History Category II. *See* PSR ¶ 114.[4]

#### C.   Sentencing Guideline Range

With respect to Count One, a final offense level of 21 and Criminal History Category II results in a guidelines range of 41 to 51 months of incarceration, three years of supervised release,

---

[3] Should the Court agree with the PSR's application of the U.S.S.G. § 2D1.1(b)(12) (the "premises" enhancement), the offense level for Count One would be increased by two points. For the reasons in the PSR's summary of the parties' objections, the United States is not seeking the enhancement as to this Defendant.

[4] For purposes of the D.C. VSG, the Defendant's criminal history is classified as Criminal History Score A.

and a fine range of $15,000 to $1,000,000. *See* U.S.S.G. §§ 5D1.2(c) and 5E1.2(c)(3).[5] The guidelines range for Count Two is the minimum term of imprisonment set by statute, here, 60 months of incarceration, and 2 to 5 years of supervised release, pursuant to U.S.S.G. § 2K2.4(b). With respect to Count Three, the DC VSG provides for a range of 48 to 120 months of imprisonment; because Count Three carries a mandatory minimum of 60 months, however, the effective guidelines range is 60 – 120 months. As a result, the Defendant's aggregate sentencing range, calculated by adding the ranges for Counts One, Two, and Three, is 161 to 171 months of incarceration.

## IV.     ARGUMENT

As stated above, the United States respectfully requests that the Court sentence the Defendant to a term of 166 months of incarceration, followed by 60 months of supervised release. As noted above, as part of the plea agreement [ECF No. 85] and pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties have agreed that a sentence of 161 to 171 months of incarceration is appropriate, and the United States further agreed to cap its allocution at 166 months. For the reasons detailed below, the United States respectfully submits that a sentence of 166 months is sufficient, but not greater than necessary, to serve the interests of justice and appropriately balances the sentencing factors under 18 U.S.C. § 3553(a).

### 1.     The Nature, Circumstances, and Seriousness of the Offense

The nature, circumstances, and seriousness of the offenses at issue here – armed drug dealing involving multiple co-conspirators, coupled with a drive-by shooting – cannot be understated. Indeed, this case is a tragic illustration of the devastating consequences of narcotics

---

[5] Because the PSR includes a final offense level of 23 as to Count One based on the application of the premises enhancement, the PSR writer calculates the guidelines range as 51 to 63 months of incarceration and a fine range of $20,000 to $1,000,000.

9

trafficking upon communities, borne out by both the costs of addiction and the associated violence that so frequently follows. And these harms are increasingly magnified when one of the drugs at issue is fentanyl.

As this Court is aware, the dangers posed by fentanyl also cannot be minimized. According to the DEA, fentanyl "is similar to morphine but about 100 times more potent [. . . .] Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction [. . . .]" *See* DEA, Facts about Fentanyl, https://www.dea.gov/resources/facts-about-fentanyl. Startingly, "two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage." *Id.* The lethality of fentanyl is reflected in nationwide statistics: roughly 97,309 people in this country died of drug overdoses in the 12-month period ending in April 2024. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of September 1, 2024).[6] Of these deaths, roughly 65,787 (or about 68 percent) involved synthetic opioids (of which fentanyl is one). *Id.* (By comparison, in 2022, 46,728 people in the United States died of firearms. *See* JHU Bloomberg School of Public Health, *Continuing Trends: Five Key Takeaways from 2023 CDC Provisional Gun Violence Data* (September 12, 2024)).[7] And, thanks in part to people like the defendants in this case, our community has been pummeled by fentanyl: in 2022, Washington, D.C., had an opioid overdose death rate of 48.9 people per 100,000—third among all the states and D.C. only to West Virginia and Delaware. *See* KFF, *Opioid Overdose Death Rates and All Drug Overdose Death Rates per 100,000 Population*

---

[6] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.

[7] https://publichealth.jhu.edu/center-for-gun-violence-solutions/2024/continuing-trends-five-key-takeaways-from-2023-cdc-provisional-gun-violence-data.

10

*(Age-Adjusted)* (2022 timeframe).[8]

Moreover, the harm wrought by the Defendant and his co-conspirators was not just inflicted upon the many addicts they served for their own pecuniary gain; rather, the crew members effectively staged an armed takeover of an entire apartment building in which innocent persons, including children, resided, forcing at least one occupant to move as a result. Indeed, it is difficult to adequately assess the impact upon those residents – or the entire neighborhood, who no doubt bore witness to their emboldened lawlessness – caused by the brazen actions of the Defendant and his co-conspirators.

Put simply, the Defendant's offenses are extremely serious in nature, given his involvement in not only drug distribution and firearms possession but also a drive-by shooting. A singular thread runs through these offenses: the Defendant's willingness to take advantage of and victimize others – apartment residents, drug users, shooting victims – for his own benefit. He placed his own interests and desires above the safety and well-being of his fellow community members. Such behavior is among the most corrosive because it causes not only immediate harm but also far reaching effects on society.

2. **The Defendant's History and Characteristics**

Although the United States recognizes the Defendant's limited criminal history, it must be noted that two of his three prior misdemeanor convictions involve assaultive conduct: a 2015 conviction for Assault on a Police Officer and a 2019 conviction for Destruction of Property, which appears to relate to an incident of domestic violence. Moreover, his prior arrests appear to involve a similar pattern of conduct. This is particularly troubling in light of the violent, armed conduct involved in this case. Moreover, and perhaps most egregious, the Defendant was employed as a

---

[8] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates.

Violence Interrupter – presumably being paid by the D.C. government to "help de-escalate situations that may turn violent" [PSR ¶ 154] during his participation in this conspiracy – *including when he chose to engage in a drive-by shooting that wounded four*.

Notwithstanding the gravity of the Defendant's conduct here, however, the United States recognizes and credits his early acceptance of responsibility. It is commendable that the Defendant was the first to accept responsibility in this case and that he indicated his intent to do so very early only. Indeed, he pled guilty to his involvement in the April 19, 2024 Mt. Olivet shooting pre-indictment. Nor does the United States overlook the impact of the Defendant's difficult childhood and personal circumstances, as detailed in the PSR. *See* PSR ¶ ¶ 128 – 130.

### 3. The Need to Promote Respect for the Law and Deterrence

As called for by the statute, the sentence should reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2). The United States respectfully submits that the need to deter not only the Defendant, but also others, weighs in favor of the recommended sentence. This is particularly true in light of the fact that the Defendant's conduct (along with those of his co-conspirators) impacted many: the entire neighborhood they operated in, the residents of the apartment building they took over, the drug users to whom they sold (as well as those users' families and friends), and the victims of the April 19, 2024 shooting.

In a case such as this, where the Defendant's actions were felt by many and visible to yet more, a prison sentence is the best measure of deterrence available to the Court, and the United States submits that a sentence of 166 months is appropriate. Such a sentence accomplishes the aims of § 3553(a)(2) in both a general and particularized manner. As applied to the Defendant, such a sentence reflects both the seriousness and dangerousness of the Defendant's conduct in this

case. With respect to general deterrence, this recommended sentence promotes respect for the law and the safety of the community by serving as a deterrent to brazen conduct such as that perpetrated by the Defendant and his co-conspirators in this case and will ensure that others are not similarly emboldened.

### 4. Other factors

The United States' recommended sentence is also justified to protect the public from the Defendant, who carried out his conduct up until his arrest in this case, as reflected in the narcotics and firearm recovered from his residence. In recognition of his limited prior criminal history, it would also give the Defendant ample time to pursue further educational and vocational training and participate in other programs that will hopefully stop his trend towards escalating violence in its tracks. In short, such a sentence reflects the consequences of his actions, while also reflecting his minimal criminal history and early acceptance of responsibility.

## V. CONCLUSION

For the foregoing reasons, the United States recommends that the Court sentence the Defendant to 166 months of imprisonment, followed by 60 months of supervised release. Such a sentence serves the interest of justice and appropriately balances the sentencing factors articulated under 18 U.S.C. § 3553(a).

        Respectfully submitted,

        BRIDGET M. FITZPATRICK
        ACTING UNITED STATES ATTORNEY
        D.C. Bar No. 474946

By:   */s/ Andrea Duvall*
      SOLOMON EPPEL
      DC Bar No. 1046323
      ANDREA DUVALL
      AR Bar No. 2013114
      Assistant United States Attorneys
      601 D Street, NW
      Washington, D.C. 20530

CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2025, a copy of the United States' Sentencing Memorandum was submitted via CM/ECF, which will transmit to counsel to the Defendant.

*/s/ Andrea Duvall*
Assistant U.S. Attorney