## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:24-cr-226-4 (BAH)** |
| | : | |
| **CHARLES MANSON,** | : | |
| **a.k.a. "CHEESE"** | : | |
| | : | |
| **Defendant.** | : | |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing as to Defendant Charles Manson (hereafter, the "Defendant").[1] On February 11, 2025, the Defendant pled guilty to a Superseding Information [ECF No. 180], charging him with: 1) Conspiracy to Distribute and Possess with Intent to Distribute 40 Grams or More of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vi), and 846 (Count One); 2) Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Two); and 3) Assault with a Dangerous Weapon, in violation of 22 D.C. Code § 402 (Count Three).

Pursuant to the terms of the plea agreement [ECF No. 196] and Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties have agreed that a sentence of 160 to 207 months of incarceration, followed by five years (60 months) of supervised release, is appropriate. For the reasons set forth below, the United States respectfully requests that the Court impose a sentence

---

[1] Sentencing is scheduled for June 26, 2025.

of 207 months of incarceration, to be followed by five years (60 months) of supervised release

## I.    FACTUAL AND PROCEDURAL BACKGROUND

As the Court is aware, the Defendant's guilty plea is the result of his deliberate participation in a violent, armed group of drug dealers known as the "21st and Vietnam" crew.  Members of the crew, some of whom identify the area they frequent as the "I Block," operated in a residential area in Northeast Washington, D.C., specifically the area colloquially known as "21st and Maryland." This refers to the area surrounding the intersection of 21st Street and Maryland Avenue NE, Washington, D.C., which consists mainly of low-rise apartments and row homes, and includes the 1900 block of I Street NE, Washington, D.C.  (I Street NE is one block south of and parallel to Maryland Avenue NE.  19th Street NE is the next street to the west of and parallel to 21st Street NE.)  In addition to being home to many D.C. residents, the area is also home to schools, playgrounds, recreational centers, and multiple businesses.

Within this D.C neighborhood alone, this crew has been responsible for the distribution of significant quantities of multiple types of narcotics, including crack cocaine, fentanyl, methamphetamine, phencyclidine ("PCP"), and n-n-dimethylpentylone ("boot").  Moreover, in a disturbing illustration of the link between drug trafficking and violence, 21st and Vietnam crew members have also been involved in multiple instances of firearms possession and shootings. These instances include two shootings charged in connection with this case: the March 7, 2024, incident in which the defendant opened fire on a passerby walking his dog near the crew's open-

air drug market; and the April 19, 2024 drive-by shooting, committed by co-defendants Briyon Shuford and Trevon Palmer, which wounded four people and terrorized others.

    A. Narcotics Trafficking

    Although they certainly did not constrain their drug activities and violence to one exclusive area, the crew members, including the Defendant, frequently used an apartment building, located at 1919 I Street NE, Washington, D.C., as a base of operations for their criminal conduct. Specifically, members of the crew built their open-air drug market around the apartment building and its surroundings, selling drugs outside in the front and the rear, as well as the in first-floor hallway of the apartment building. These sales occurred on a near daily basis between at least June 2023, when the investigation began, and May 2024, when they were arrested. Indeed, the Defendant and other crew members were so emboldened by their perceived invincibility that when one of the apartments became vacant (Apartment 101), they did not hesitate to begin using it for their own nefarious purposes.

    Nor was the Defendant a peripheral figure in the conspiracy. On the contrary, the Defendant himself resided in the 1919 I Street NE apartment building during the course of the conspiracy. It is unclear whether he began residing in the building only after it became the group's base of operations, or if he was such an integral member of the group that they chose that building because of his connections to it. What is clear, however, is that he was a key player in the group, regularly working with his co-conspirators to distribute narcotics in and around the building, discussing firearms, and ensuring the success of their operations. Indeed, in just over four months – between early December 2023 and late April 2024, the Defendant sold drugs to law enforcement and/or confidential informants on eight separate occasions. Nor were his sales limited to just one substance: in just those eight controlled purchases, law enforcement purchased cocaine, cocaine

base, fentanyl, and "boot" from the Defendant.

B. March 7, 2024 Shooting

As this Court is aware, there is a strong correlation between drugs and guns, and this case is emblematic of the ways in which drug dealing in conjunction with firearms ends in violence. A chilling example of this is the March 7, 2024 shooting, in which the defendant shot at a community member ("V-1") walking his/her dog in front of 1919 I Street NE. Following a verbal altercation between the victim and members of the crew, who were standing in front of the apartment building, the defendant re-entered the apartment building, specifically Apartment 101, and donned a mask before arming and readying himself for his brazen broad daylight assault on V-1. The defendant then exited the apartment building through the rear before coming around to the front, all while opening fire in V-1's direction across a busy street. Although no one was injured, the Defendant engaged in a senseless act of violence that could have ended in tragedy, particularly given that one of his co-conspirators was nearly struck. Below is a series of images that demonstrate some of the events leading up to and immediately following the shooting:



***Figures A-B: Jenkins (l) hands the Defendant (r) a mask in Apt. 101***



*Figures C-D: the Defendant arms himself before exiting the building's rear entrance*



*Figure E: the Defendant opens fire*



*Figures F-G: the Defendant re-enters through the building's rear entrance post-shooting*

C.  May 15, 2024 Recoveries

The Defendant's involvement with firearms and narcotics is also borne out by the search warrant executed on May 15, 2024, when the Defendant was arrested at his residence, located at 1919 I Street NE, Apartment 002, Washington, D.C.  Inside the apartment, law enforcement recovered the following: (1) a Glock 17 9mm handgun with serial number BGSV071 and a chambered round; (2) a firearm magazine with a 31-round capacity and 21 rounds; (3) a black handgun magazine; (4) a box of ammunition; (5) approximately 50.07 grams of fentanyl analogue; (6) approximately 13.88 grams of cocaine; and (7) drug paraphernalia (including empty pill capsules and a digital scale).

## II.    LEGAL STANDARD

Pursuant to 18 U.S.C. § 3553(a), the Court shall impose a sentence that is sufficient, but not greater than necessary, to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and to "provide the defendant with needed educational or vocational training."  18 U.S.C. § 3553(a)(2).  In addition, the Court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" the types of sentences available, the Sentencing Guidelines; any pertinent policy statements; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims. *Id.* § 3553(a).

The listed factors in 18 U.S.C. § 3553(a) include the following:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The need for the sentence imposed –
   a) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   b) To afford adequate deterrence to criminal conduct;

    c) To protect the public from further crimes of the defendant; and

    d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The kinds of sentence and the sentencing range established for –
    a) The applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
      i) Issued by the Sentencing Commission . . . ; and
      ii) That . . . are in effect on the date the defendant is sentenced

5) Any pertinent policy statement –
    a) Issued by the Sentencing Commission . . . and
    b) That . . . is in effect on the date the defendant is sentenced

6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7) The need to provide restitution to any victims of the offense.

Procedurally, after calculating the applicable Guidelines range, the Court should next consider all the applicable factors set forth in 18 U.S.C. § 3553(a). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007).

## III.    GUIDELINES CALCULATION

### A.    Total Offense Level

With respect to Count One, the base offense level for a violation of 21 U.S.C. § 841(a)(1) is governed by U.S.S.G. §§ 2D1.1(a)(5) and (c)(4). As detailed in the Final Presentence Report (the "PSR") [ECF No. 267] and the plea agreement [ECF No. 196], the base offense level for Count One is 28 because the Defendant is accountable for at least 700 KG but less than 1,000 KG of Converted Drug Weight (including approximately 16.346 grams of cocaine base, 13.88 grams

of cocaine, 110.29 grams of fentanyl, and 50.07 grams of fentanyl). After adjustments for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a) and (b), the final offense level for Count One is 25.

As to Count Two, the applicable guidelines sentence for a violation of 18 U.S.C. § 924(c)(1)(A)(i) is governed by U.S.S.G. § 2K2.4(b). Pursuant to U.S.S.G. § 5C1.2, Chapters Three (Adjustments) and Four (Criminal History) do not apply. For Count Three, a violation of 22 D.C. Code § 402 is governed by the D.C. Voluntary Sentencing Guidelines ("D.C. VSG") and falls within Offense Severity Group 6.

### B.    Criminal History Category

The PSR writer calculates the Defendant to have a total of six criminal history points, which places him in Criminal History Category III. *See* PSR ¶ 130. [2]

### C.    Sentencing Guideline Range

For Count One, which carries a five-year mandatory minimum term of imprisonment, a final offense level of 25 and Criminal History Category III results in a guidelines range of 70 to 87 months of incarceration, 4 to 5 years of supervised release, and a fine range of $20,000 to $1,000,000. *See* U.S.S.G. §§ 5D1.2(c) and 5E1.2(c)(3). The guidelines range for Count Two is the minimum term of imprisonment set by statute, here, 60 months of incarceration, and 2 to 5 years of supervised release, pursuant to U.S.S.G. § 2K2.4(b). With respect to Count Three, the DC VSG provides for a range of 30 to 72 months of imprisonment. [3] As a result, the Defendant's aggregate sentencing range, calculated by adding the ranges for Counts One, Two, and Three, is 160 to 219 months of incarceration.

---

[2] For purposes of the D.C. VSG, the Defendant's criminal history is classified as Criminal History Score C.

IV.    **ARGUMENT**

As stated above, the United States respectfully requests that the Court sentence the Defendant to a term of 207 months of incarceration, followed by 60 months of supervised release. For the reasons detailed below, the United States respectfully submits that a sentence of 207 months is sufficient, but not greater than necessary, to serve the interests of justice and appropriately balances the sentencing factors under 18 U.S.C. § 3553(a).

1.        **The Nature, Circumstances, and Seriousness of the Offense**

The circumstances of this case – including this Defendant's specific conduct – involve significant narcotics trafficking of multiple types of narcotics, accompanied by gun violence. While each – standing alone – pose incredible risk to the public and cause grave societal harm, it is difficult to imagine a more lethal combination.

According to the DEA, fentanyl "is similar to morphine but about 100 times more potent [. . . .] Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction [. . . .]" *See* DEA, Facts about Fentanyl, https://www.dea.gov/resources/facts-about-fentanyl. Startingly, "two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage." *Id.*    The lethality of fentanyl is reflected in nationwide statistics: roughly 97,309 people in this country died of drug overdoses in the 12-month period ending in April 2024.  *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of September 1, 2024).[4]   Of these deaths, roughly 65,787 (or about 68 percent) involved synthetic opioids (of which fentanyl is one).  *Id.*   (By comparison, in 2022, 46,728 people in the United States died of firearms.  *See* JHU Bloomberg

---

[4] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.

School of Public Health, *Continuing Trends: Five Key Takeaways from 2023 CDC Provisional Gun Violence Data* (September 12, 2024)).[5]  And, thanks in part to people like the defendants in this case, our community has been pummeled by fentanyl: in 2022, Washington, D.C., had an opioid overdose death rate of 48.9 people per 100,000—third among all the states and D.C. only to West Virginia and Delaware. *See* KFF, *Opioid Overdose Death Rates and All Drug Overdose Death Rates per 100,000 Population (Age-Adjusted)* (2022 timeframe).[6]

This Court is already aware that the damage caused by the Defendant and his co-conspirators extended well beyond the cost of addiction in terms of human suffering.  The actions of the Defendant and his co-conspirators brought terror, instability, and danger to an entire neighborhood community and beyond.  As the United States has previously noted, it is difficult to adequately assess the impact upon the residents of 1919 I Street NE or the entire neighborhood, who bore witness to their emboldened lawlessness, caused by the brazen actions of the Defendant and his co-conspirators.  This is particularly true when one considers the impact of the Defendant's actions in opening fire across a busy street in a residential neighborhood in broad daylight, which impacted not only the intended target but all who witnessed it.  Put simply, the nature and circumstances of the Defendant's offenses, which involved significant narcotics trafficking, firearms possession, and the actual *use* of firearms, are extremely serious in nature.

2.      **The Defendant's History and Characteristics**

The United States recognizes not only the Defendant's acceptance of responsibility but also the incredibly difficult circumstances of his life, as detailed in the PSR.  *See* PSR ¶ ¶ 143-145.  Although those circumstances and the significant impact they no doubt had on the Defendant

---

[5] https://publichealth.jhu.edu/center-for-gun-violence-solutions/2024/continuing-trends-five-key-takeaways-from-2023-cdc-provisional-gun-violence-data.
[6] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates.

provides important background that cannot be minimized, the United States remains incredibly concerned about the danger that the Defendant poses to the community.  Since the age of 15, he has accumulated multiple arrests and convictions, including for conduct in the very same neighborhood he terrorized in the instant case.  Even setting aside the incredibly callous manner in which he shot at the victim in this case with no regard for the safety of others, his history evinces a continued disregard for both the law and other human beings.

For example, in conjunction with his 2009 arrest for attempted burglary and assault on a police officer, it appears he not only fought with law enforcement but also took the officer's firearm during the struggle, resulting in the gun's discharge.  In 2011, the Defendant robbed a group at gunpoint.  Notably, both offenses occurred in the very same neighborhood involved in this case.  The PSR details a number of other similarly troubling incidences, as well as a continued disregard for the law.  *See* PSR ¶ ¶ 122-125, 135-137.  Although his most recent arrest was in 2012, a close review of the timeline in that case shows that he was released in November 3, 2023 – a mere month before he first sold narcotics to a confidential informant in December 2023.

In sum, it is clear that the Defendant has experienced significant hardship and difficulty in his life, and the United States is not unsympathetic to those circumstances.  It is also clear, however, that the Defendant has chosen to repeatedly engage in unlawful conduct – often aggressive or assaultive – and been unwilling or unable to refrain from such conduct, even during times when he was incarcerated.  Indeed, he had been released little more than a month when he began selling narcotics – and a mere four months later, he engaged in the callous, broad daylight shooting mentioned above.

### 3.    The Need to Promote Respect for the Law and Deterrence

As called for by the statute, the sentence should reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2). The United States respectfully submits that the need to deter not only the Defendant, but also others, weighs in favor of the recommended sentence. As the United States has noted before, the need for deterrence is particularly significant here, where the Defendant's conduct (along with those of his co-conspirators) impacted many: the entire neighborhood they operated in, the residents of the apartment building they took over, and the drug users to whom they sold (as well as those users' families and friends).

In a case such as this, where the Defendant's actions were felt by many and visible to yet more, and where the Defendant has long been engaged in criminal activity in the very same area, a substantial prison sentence is the best measure of deterrence available to the Court, and the United States submits that a sentence of 207 months is appropriate. Such a sentence accomplishes the aims of § 3553(a)(2) in both a general and particularized manner. As applied to the Defendant, such a sentence reflects both the seriousness and dangerousness of the Defendant's conduct in this case. This is particularly true where, as here, the Defendant has yet to be deterred, engaged in the instant conduct mere months after being released after having served a significant period of incarceration. With respect to general deterrence, this recommended sentence promotes respect for the law and the safety of the community by serving as a deterrent to brazen conduct such as that perpetrated by the Defendant and his co-conspirators in this case, and it will ensure that others are not similarly emboldened.

### 4.    Other factors

The United States' recommended sentence is also justified to protect the public from the

Defendant, who carried out his conduct up until his arrest in this case, as reflected in the significant quantity of narcotics and the firearm recovered from his residence. It would also give the Defendant ample time to pursue further educational and vocational training and participate in other programs that will hopefully stop his trend towards escalating violence in its tracks and ensure his ability to find employment upon his release. In short, such a sentence reflects the consequences of his actions and his criminal history.

## V.    CONCLUSION

For the foregoing reasons, the United States recommends that the Court sentence the Defendant to 207 months of imprisonment, followed by 60 months of supervised release. Such a sentence serves the interest of justice and appropriately balances the sentencing factors articulated under 18 U.S.C. § 3553(a).

Respectfully submitted,

JEANINE FERRIS PIRRO
INTERIM UNITED STATES ATTORNEY

By:    */s/ Andrea Duvall*
SOLOMON EPPEL
DC Bar No. 1046323
ANDREA DUVALL
AR Bar No. 2013114
Assistant United States Attorneys
601 D Street, NW
Washington, D.C. 20530